# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### February 2, 2010 Session

## STATE OF TENNESSEE v. GERALD McEWEN

### Direct Appeal from the Criminal Court for Shelby County
### No. 07-00466     Paula Skahan, Judge

---

### No. W2009-00309-CCA–R3-CD  - Filed September 24, 2010

---

A Shelby County jury convicted the defendant, Gerald McEwen, of one count of first degree murder and one count of criminal attempt to commit first degree murder, a Class A felony. The trial court sentenced him as a Range I violent offender to life with the possibility of parole for the murder conviction and as a Range I standard offender to fifteen years for the attempted murder conviction. The court ordered him to serve the sentences concurrently in the Tennessee Department of Correction. On appeal, the defendant argues that (1) the trial court violated his right to due process by denying his counsel the opportunity to rehabilitate a prospective juror and by reprimanding the prospective juror in front of the jury venire; (2) the trial court erred by denying his *Batson* challenge; (3) the trial court erred by admitting evidence in violation of Tennessee Rule of Criminal Procedure 16; and (4) the evidence was insufficient to support his convictions. Following our review, we affirm the judgments of the trial court.

Tenn. R. App. P. 3 **Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ. joined.

Edward P. Bronston and Vicki M. Carriker (on appeal), Memphis, Tennessee, Robert W. Jones, Shelby County Public Defender, and Donna Armstard and Constance J. Barnes (at trial) Assistant Public Defenders, Memphis, Tennessee, for the appellant, Gerald McEwen.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; and Betsy Carnesale, Paul Goodman and James Wax, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## Background

On January 30, 2007, a Shelby County grand jury indicted the defendant, Gerald McEwen, for the premeditated murder of Nicholas Powell, also known as Nicholas Harris, and for the attempted premeditated murder of Darren Champion. The defendant's jury trial began December 9, 2008, and the parties presented the following evidence.

*State's Proof.* Ernestine Harris, the step-mother of Nicholas Harris, testified that Mr. Harris was nineteen when he was shot on June 13, 2004. As a result of the shooting, he was paralyzed from the neck down. He passed away on July 22, 2005.

Darren Champion testified that at approximately 12:00 a.m., June 13, 2004, he went to Club Flippers on Hollywood Street in Memphis, Tennessee, with Nicholas Harris, Corry Sellmon, Chris Williams, and Derwin Mosby. After leaving the club, the group parked in a First Tennessee Bank parking lot and entered a neighboring Mapco convenience store. Mr. Champion purchased a beverage and was drinking it as he walked out of the store. When he walked out, someone shot him. He testified that he went back into the store but did not remember what happened after that. He spent one week at the Regional Medical Center ("the Med"). Mr. Champion testified that he was shot in the back and required surgery.

Mr. Champion further testified that no one directly threatened him at the club on June 13, but he heard that Robert Wordlow had made threats concerning him. He said that he saw Mr. Wordlow at the club that night and that they both went to Craigmont High School. He did not see who shot him. Mr. Champion testified that neither he nor Mr. Harris were armed.

Ladarius Weathersby testified that he knew Mr. Champion and Mr. Wordlow because he also attended Craigmont High School. Mr. Weathersby said that on June 12, 2004, he drove Mr. Wordlow and Kevin Swannigan to Club Flippers and dropped them off between 10:30 p.m. and 11:00 p.m. He did not go into the club because he had other plans. He received a phone call from Mr. Wordlow between 11:30 p.m. and 12:00 a.m. asking him to come back to the club. Mr. Weathersby returned to the club and picked up Mr. Wordlow and Mr. Swannigan.

Mr. Weathersby further testified that after leaving the club, he went across the street and stopped at the edge of First Tennessee Bank's driveway because of a fight occurring in the middle of the street. Mr. Weathersby was preparing to make a right turn onto Hollywood Street when Mr. Wordlow exited the car, saying that he saw someone that he knew. At the time, Mr. Weathersby did not know whom Mr. Wordlow saw, but he testified that he learned

it was the defendant. Mr. Weathersby testified that the defendant was three cars behind him, and Mr. Wordlow spoke with the defendant briefly. According to Mr. Weathersby, the defendant was driving a "[g]reen Stratus." The defendant stepped out of his car after speaking with Mr. Wordlow. Mr. Weathersby testified that he then heard gunshots. He looked back and saw the defendant firing a weapon towards the Mapco convenience store. He heard approximately ten gunshots. Mr. Weathersby said that his first instinct was to freeze. Mr. Wordlow ran back to Mr. Weathersby's car, and then Mr. Weathersby drove away. He testified that he was not armed that night, and Mr. Wordlow and Mr. Swannigan were not armed, either. Mr. Weathersby said that they were all silent as they drove away. He admitted that he was scared. He dropped Mr. Wordlow off at his house, and then he went home. Mr. Weathersby said that when he learned who the defendant shot, he went to the hospital because he knew Mr. Champion. However, he was unable to visit Mr. Champion because of his condition.

Mr. Weathersby testified that he did not speak to the police until after the death of Nicholas Harris, when they approached him. The police showed him a photospread, and he identified the defendant as the shooter. Mr. Weathersby testified that he has not spoken to Mr. Wordlow since June 13, 2004, because he attributed his involvement in this case to his giving Mr. Wordlow a ride that night.

On cross-examination, Mr. Weathersby testified that he believed that Mr. Wordlow was involved in the shooting. He said that he did not speak to the police until they approached him because he was scared. He received threatening phone calls for two weeks after the shooting but received no other threats. Mr. Weathersby testified that he watched Mr. Wordlow and the defendant through the driver's side door mirror on his car.

Memphis Police Officer Andre Muhammad testified that on June 13, 2004, he was on his way home after his shift and approximately one half-mile from the Mapco convenience store on Hollywood Street when he heard the shots-fired call over his radio. When he arrived at the location, he observed a male laying on the ground. He exited his vehicle and approached, observing that the male had been shot. Officer Muhammad learned that another shooting victim was inside the store. Officer Muhammad received information from the bystanders that a black male was responsible for the shooting, and the bystanders last saw the man in a green Dodge Stratus driving northbound on Hollywood Street. He recalled seeing a shell casing by the victim.

Christopher Williams testified that he went with Nicholas Harris, Darren Champion, Corry Sellmon, and Derwin Mosby in Mr. Sellmon's gray Dodge Stratus to Club Flippers on June 12, 2004. They left when the club closed and drove across the street to the First Tennessee Bank parking lot. From there, they went to the Mapco convenience store to buy

drinks. Only Mr. Champion and Mr. Mosby went inside the store. The rest of the group remained outside. When Mr. Champion and Mr. Mosby returned to the parking lot, Mr. Williams observed a man wearing a blue t-shirt and blue jeans standing by a green car, which was either a Plymouth Breeze or a Dodge Stratus. The man asked Mr. Champion whether he was "Champ" and then pulled out a gun. Mr. Champion began running, and the shooter started shooting at them. Mr. Williams heard eight shots. He testified that Mr. Harris fell to the ground when he was shot, and Mr. Champion ran back inside the store. Mr. Williams said that Mr. Harris had been shot in the neck. Mr. Williams saw the shooter get into his car and drive away. He said that the gun was black and either a .9-millimeter or a .45-caliber.

Mr. Williams testified that he saw Robert Wordlow at the club that night. He later saw Mr. Wordlow in a car with Mr. Weathersby and Mr. Swannigan. He knew them because they all went to Craigmont High School. He did not see Mr. Wordlow near the shooter. Mr. Williams testified that neither he nor his friends were armed that night.

On cross-examination, Mr. Williams testified that the shooter fired one shot. Then, someone said, "'Keep busting, keep busting, Cus[,]'" and the shooter continued firing.

Derwin Mosby corroborated Mr. Williams's testimony, adding that a bullet went through his shirt but did not touch him.

On cross-examination, Mr. Mosby testified that he saw Robert Wordlow in the club that night. In December 2004, he identified Mr. Wordlow in a photospread based on a rumor he heard around the neighborhood that Mr. Wordlow was "the one who called his people to shoot[.]"

Dr. Kenneth Snell, a medical examiner, testified that Nicholas Harris, who was initially identified as Nicholas Powell, died of complications from a gunshot wound to the neck. He said that the bullet struck Mr. Harris's sixth vertebrae, causing quadriplegic paralysis. As a result of his paralysis, Mr. Harris developed pneumonia and septicemia, which eventually caused his death.

Corry Sellmon testified that he drove Mr. Harris, Mr. Champion, Mr. Mosby, and Mr. Williams to Club Flippers on June 12, 2004. After leaving the club, he parked in the First Tennessee Bank parking lot, and the group went into the Mapco convenience store next door to the bank. When he returned to the parking lot, he noticed Mr. Weathersby, Mr. Swannigan, and Mr. Wordlow were in a black car in the bank parking lot. He said that he noticed them because he had heard that they did not like Mr. Champion. While he was talking to one of his friends, he saw a green Dodge Stratus drive into the bank parking lot. He heard a single gunshot. Mr. Sellmon testified that he did not know from what direction

the first gunshot came, but when the shooter fired five to six more times, he realized that the shooter was a black male with a dark complexion standing by the green Stratus. Mr. Sellmon testified that he also drives a Stratus and agreed that the Stratus and the Plymouth Breeze have the same body type. He further agreed that he originally told police that the car was either a Breeze or a Stratus. After the shooting, he did not see the black car or the green car.

Maxwell "Butch" Keith, Senior Deputy Court Clerk in the City Court Clerk's Office, testified that a police officer issued a seatbelt violation citation to the defendant on April 12, 2004. The citation listed the defendant's vehicle as a green 1997 Plymouth Breeze. According to the clerk's records, the defendant did not appear at his May 12, 2004, court date. Mr. Keith testified that the citation bore the defendant's name on the signature line.

On cross-examination, Mr. Keith agreed that he was not a handwriting expert and was not familiar with the defendant's signature. He further agreed that police officers were responsible for verifying the identity of the person to whom they issued citations, but sometimes people assume another person's identity and sign the citation in that person's name.

*Defense Proof.* Kenya Champion, Mr. Champion's sister, testified that several weeks prior to the shooting, she and her brother attended a friend's birthday party. She recalled that Mr. Wordlow also attended the party. After the party was over, Mr. Wordlow and his friends were riding on the tops of cars up and down the street. Some of Mr. Champion's friends "jumped" Mr. Wordlow and his friends. Ms. Champion said that her brother was not involved because she called him to tell him about the fight and he was at home.

After the close of proof and deliberations, the jury found the defendant guilty as charged. The trial court sentenced him as a Range I violent offender to life with the possibility of parole for the murder conviction and as a Range I standard offender to fifteen years for the attempted murder conviction. The court ordered him to serve the sentences concurrently in the Tennessee Department of Correction.

**Analysis**

I. Voir Dire

The defendant argues that the trial court violated his due process rights by not allowing his counsel the opportunity to rehabilitate a prospective juror and by reprimanding that prospective juror in the presence of the venire. The state responds that the trial court did not abuse its discretion by excusing the prospective juror for cause. We agree with the state.

Article I, section 9 of the Tennessee Constitution guarantees a criminal defendant the right to trial "by an impartial jury." The purpose of voir dire is "to see that jurors are competent, unbiased, and impartial" and to allow counsel to "discover[] bases for challenge for cause and [to] intelligently exercise[] peremptory challenges." *State v. Howell*, 868 S.W.2d 238, 247 (Tenn. 1993); Tenn. R. Crim. P. 24(b)(1). "[T]he decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court." *Howell*, 868 S.W.2d at 247. Under Rule 24 of the Tennessee Rules of Criminal Procedure, "[o]nce a prospective juror admits to having formed an opinion, he shall be subject to challenge for cause unless the examination shows unequivocally that he can be impartial." *State v. Crawford*, 620 S.W.2d 543, 545 (Tenn. Crim. App. 1981). Rule 24 also "gives the trial judge the right to excuse a juror for cause without examination of counsel." *State v. Austin*, 87 S.W.3d 114, 472 (Tenn. 2002). This court will not overturn a trial court's ruling on the qualifications of a juror unless the opponent of the ruling shows an abuse of the court's discretion. *State v. Kilburn*, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989).

During the voir dire in this case, the prosecutor asked prospective Juror Cotton whether she would be able to follow the law and convict the defendant of first degree murder if she did not have a reasonable doubt as to his guilt. Ms. Cotton replied, "Not really." (IV, 157). After the prosecutor discussed the varying degrees of homicide, Ms. Cotton said that she would not be able to convict the defendant of first degree murder and that she knew of a case where someone received six months for shooting a person. The prosecutor asked that the court remove Ms. Cotton for cause, and the court then questioned her as follows.

> THE COURT: Well, Ms. Cotton, that's based on you thinking about other cases where you may or may not know all of the facts involved.
>
> PROSPECTIVE JUROR: Right. But I mean you still – it's a different situation. You never know –
>
> THE COURT: Right.
>
> PROSPECTIVE JUROR: Like I said, I've known people to shoot somebody right there, and they only get six months. Why should – he just shot somebody and he get first-degree?
>
> THE COURT: Okay. And do you know whether in that case there might have been an argument for self-defense?
>
> PROSPECTIVE JUROR: Well, yeah, it was a dispute of violence, but I still say don't nobody [sic] deserve to die, you know, and I would think –

-6-

THE COURT: Who [are] you talking about dying?

PROSPECTIVE JUROR: No, I'm just saying in general. A person still don't [sic] end up – I mean have their reason to kill somebody no matter what the situation is.

THE COURT: Okay. Right.

PROSPECTIVE JUROR: So I couldn't consider – I mean first – first-degree.

THE COURT: Under any circumstances –

PROSPECTIVE JUROR: No.

THE COURT: – whether he came up and executed the man in the back of the head while he was lying on the ground, you couldn't consider first-degree murder?

PROSPECTIVE JUROR: I mean I think about it's a different situation –

THE COURT: Exactly, everything is different.

PROSPECTIVE JUROR: – so I wouldn't – I – he didn't do that so I couldn't say that.

THE COURT: You haven't heard any of the proof, and you're telling me you can't listen to the facts with an open mind –

PROSPECTIVE JUROR: Uh-huh. Yeah.

THE COURT: – and follow the law?

PROSPECTIVE JUROR: Yeah. I can do that but that's –

THE COURT: That's all we're asking you to do. But what you were saying is no matter what the facts and no matter what I give you as the law, and I'm going to give you all of the law that you will need. Okay. And you are to apply that to the facts as you determine them to be. Right?

PROSPECTIVE JUROR: Right.

THE COURT: What you were saying is under no circumstances could you find first-degree murder because of a case you're thinking about where someone got six months?

PROSPECTIVE JUROR: No. I'm not basing my opinion on that.

THE COURT: Okay. Well, that's what you said.

PROSPECTIVE JUROR: Okay. But – no, I'm not going to renege on it. No.

THE COURT: Okay.

PROSPECTIVE JUROR: That's the bottom line, no.

THE COURT: You can't follow the law and listen to the facts?

PROSPECTIVE JUROR: No.

THE COURT: And it's based on another case that you're thinking about?

PROSPECTIVE JUROR: No.

THE COURT: What is it based on?

PROSPECTIVE JUROR: Just – what I just said, you know, I can't consider that, and we're going back and forth. I'm just saying I can't consider that –

THE COURT: Okay.

PROSPECTIVE JUROR: – and that's my opinion.

THE COURT: What I'm going to have you – what I'm going to have you do is I'm going to have you stay in this courtroom through the entire week and watch all of the court and watch the trial. Okay. Just have a seat in the courtroom.

It is clear from this extended colloquy that the trial court gave Ms. Cotton every opportunity to declare that she would impartially follow the law. There was no "leeway for rehabilitation" after Ms. Cotton said, "That's the bottom line . . . ." *See State v. Alley*, 776 S.W.2d 506, 518 (Tenn. 1989). The defendant's argument that the trial court's refusal to

allow defense counsel to rehabilitate the prospective juror violated his due process is totally misplaced. In support of his argument, the defendant cites to *dicta* in *State v. Hurley*, wherein the supreme court explained that the Supreme Court of Florida held that it violated due process when the trial court allowed the state to rehabilitate a prospective juror but did not allow the defense to rehabilitate. 876 S.W.2d 57, 65 (Tenn. 1993) *superseded by statute on other grounds as stated in State v. Price*, 46 S.W.3d 785, 800 n. 1 (Tenn. Crim. App. 2000). The defendant makes no argument, and the record does not support the contention, that the trial court allowed the state to rehabilitate a potential juror while not allowing the defense to do so. We conclude, therefore, that the trial court's refusal to allow the defense to rehabilitate a prospective juror – after that juror unequivocally stated that she would not follow the law – did not violate the defendant's right to due process. Furthermore, the defendant has waived his argument that the trial court violated his right to due process by ordering Ms. Cotton to observe the court proceedings throughout the week because the defendant has failed to cite authority to support his argument. Tenn. Ct. Crim. App. R. 10(b); *State v. Schaller*, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997). Finally, the defendant has not shown that the trial court abused its discretion in removing Ms. Cotton for cause. Accordingly, the defendant is not entitled to relief on this issue.

II. *Batson* Challenge

The defendant contends that the trial court erred by denying his *Batson* challenge. Specifically, the defendant argues that the trial court did not evaluate whether the state exercised its peremptory challenges with discriminatory intent. The state responds that it offered racially neutral reasons for striking the five jurors in question and that the defense did not prove that the state acted with purposeful discrimination. We agree with the state.

In *Batson v. Kentucky*, the United States Supreme Court held that a state's use of peremptory challenges to intentionally exclude jurors of the defendant's race violates the defendant's right to equal protection. 476 U.S. 79, 89 (1986). The court upheld this principle in *Powers v. Ohio*, but eliminated the requirement that the defendant and the potential juror share the same race. 499 U.S. 400, 415 (1991). The court subsequently held that peremptory strikes based solely on gender are also constitutionally impermissible. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 (1994); *see State v. Turner*, 879 S.W.2d 819, 821-23 (Tenn. 1994).

A defendant seeking to raise a *Batson* claim must first make a prima facie showing of purposeful discrimination against a prospective juror. *Batson*, 476 U.S. at 93-94. The defendant must establish that a consideration of all the relevant circumstances raises an inference of purposeful discrimination. *Woodson v. Porter Brown Limestone Co.*, 916 S.W.2d 896, 903 (Tenn. 1996). Once the defendant establishes a prima facie showing of purposeful discrimination, the burden then shifts to the state to establish a neutral basis for

the challenge. *Batson*, 476 U.S. at 97. The state's explanation cannot be based on mere "stereotypical assumptions," but it need not rise to the level of a challenge for cause. *State v. Ellison*, 841 S.W.2d 824, 826 (Tenn. 1992) (citing *Batson*, 476 U.S. at 97). This essentially "comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible," which might include consideration of such factors as the prosecutor's demeanor, the reasonableness or improbability of the explanation, and the relationship to accepted trial strategy. *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003).

In ruling on peremptory challenges, the trial court must give specific reasons for each of its factual findings. *Woodson*, 916 S.W.2d at 906. The trial court should explain why the objecting party has or has not established a prima facie showing of purposeful discrimination. If the defendant has made a prima facie showing, the court must determine whether the state gave a neutral reason and whether it finds that the challenge was the result of purposeful discrimination. *State v. Carroll*, 34 S.W.3d 317, 319 (Tenn. Crim. App. 2000). The trial court's findings are to be accorded great weight and will not be set aside unless they are clearly erroneous. *Woodson*, 916 S.W.2d at 906; *see also Miller-El*, 537 U.S. at 339-340 (noting that deference to the trial court is necessary relating to credibility).

In this case, the record indicates that the state exercised six peremptory challenges. Five of the challenged jurors were African-American. The defense objected, arguing that the state had used its peremptory challenges to strike African-Americans in violation of *Batson*. However, the defense did not elaborate on its *Batson* objection. The trial court determined that the defense's objection was "a good *Batson* challenge" and asked the state to give their reasons for challenging the prospective jurors. The state gave its reasons for all six of the peremptory challenges: Ms. Ford and Ms. Woods had nephews serving sentences for first degree murder convictions, Ms. Carthen was "virtually non-responsive," Mr. Taylor "had a hard time understanding [the court] and responding," Mr. Mimes was hesitant when asked whether his prior conviction would affect his impartiality in this case, and Ms. Bohannon's son was incarcerated on a pending aggravated assault charge. The trial court accepted the state's proffered race-neutral reasons and overruled the defense's challenge.

Before beginning our review of the individual challenges, we note that the trial court failed to specifically articulate its reasons for overruling the challenge on the record, with the exception of explaining why it overruled the challenge regarding Mr. Taylor. Our supreme court in *State v. Hugueley*, 185 S.W.3d 356 (Tenn. 2006), set out the procedure for analyzing a *Batson* challenge when the trial court had made insufficient findings. 185 S.W.3d at 371. After reviewing the first two prongs of the *Batson* test – whether the defense made a prima facie showing of purposeful discrimination and whether the prosecution offered racially neutral justifications for exercising its peremptory challenges – the supreme court relied on the United States Supreme Court's opinion in *Miller-El v. Dretke*, 545 U.S. 231 (2005)

("*Miller-El II*") to fashion an analysis for determining "whether the record before [the court] contains such strong evidence of impermissible discriminatory intent by the prosecution as to render clearly erroneous the trial court's determination that [the defendant] failed to establish purposeful discrimination by the prosecution in its peremptory challenges." *Hugueley*, 185 S.W.3d at 374. The United States Supreme Court in *Miller-El II* examined the "bare statistics" of the jury selection, the disparate treatment of African-American prospective jurors in comparison to Caucasion venire members, and the prosecution's history of peremptorily challenging prospective jurors based on race. *Miller-El II*, 545 U.S. at 372-73. We will follow the same procedure in this case. *See State v. Eric Cathey*, No. W2008-01446-CCA-R3-CD, 2010 WL 2836632, at *11 (Tenn. Crim. App., at Jackson, July 20, 2010).

Five of the six prospective jurors peremptorily challenged by the state were African-American. Therefore, we agree with the trial court that the defendant made a prima facie showing that the prosecutor had exercised peremptory challenges on the basis of race. *Batson*, 476 U.S. at 94.

We next look to the state's explanation for exclusion of the venire members in question. This step "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* (quoting *Hernandez*, 500 U.S. 352, 360 (1991)). We note that the record reveals that Ms. Ford and Ms. Woods were African-American but does not reveal the races of the remaining excluded jurors; therefore, we will consider the state's explanations for challenging each of the six prospective jurors. Here, three of the prospective jurors had close family members in jail, the state complained about the responsiveness of two of the jurors, and the state was concerned with the remaining juror's hesitancy regarding whether his prior conviction would affect his impartiality. This court has previously held that the state provided a race-neutral reason for excluding a prospective juror based upon that juror having relatives who stood convicted of crimes. *See State v. Marcus Antonio Logan*, No. W2008-00736-CCA-R3-CD, 2009 WL 782757, at *3 (Tenn. Crim. App., at Jackson, March 25, 2009) *perm. to appeal denied* (Tenn. Aug. 17, 2009). Therefore, we conclude that the state presented facially race-neutral reasons for excluding Ms. Ford, Ms. Woods, and Ms. Bohannon. The state challenged the remaining prospective jurors based on their demeanor during questioning. "Many of the judgments made by counsel in picking a jury are purely intuitive and based upon inarticulable factors." *Carroll*, 34 S.W.3d at 320 (quoting *United States v. Bentley-Smith*, 2 F.3d 1368, 1374 (5th Cir.1993)). Thus, subjective considerations are permitted because of the inherent nature of peremptory challenges. *Id.* Therefore, we further conclude that the state presented facially race-neutral reasons for challenging Mr. Taylor, Mr. Mimes, and Ms. Carthen.

While we do not have a complete record regarding the racial makeup of the venire, we can infer from the United States Census Records for Shelby County that a significant portion of the venire was African-American because the Census Bureau estimated Shelby County's population, in 2008, to be 52% African-American. U.S. Census Bureau, Shelby County, Tennessee Quick Facts, (April 22, 2010) http://quickfacts.census.gov/qfd/states/47/47157.html (data available in chart form); *see also Cathey*, 2010 WL 2836632, at *13. The record reveals that eight members of the trial jury were African-American, while six were Caucasian. However, "[t]hese bare statistics do not, in and of themselves, convince us that the State's proffered race-neutral reasons for excusing the [jurors] were merely pretextual." *Hugueley*, 185 S.W.3d at 374. As in *Hugueley*, our review of the record indicates that there was no disparate treatment of African-American prospective jurors in comparison to Caucasian prospective jurors. *Id.* Furthermore, the record does not indicate that the state has a history of excluding African-American prospective jurors. *Id.* Accordingly, we conclude that the record does not contain "strong evidence of impermissible discriminatory intent by the prosecution as to render clearly erroneous the trial court's determination that [the defendant] failed to establish purposeful discrimination by the prosecution in its peremptory challenges." *Hugueley*, 185 S.W.3d at 374. Therefore, the defendant is without relief as to this issue.

### III. Traffic Ticket

The defendant argues that the trial court erred by admitting into evidence a traffic citation that the defendant received two months prior to the shooting. Specifically, the defendant contends that the state violated discovery procedures under Rule 16 of the Tennessee Rules of Criminal Procedure and that the ticket was unfairly prejudicial. The state responds that there was no discovery violation and that the ticket was relevant and not unfairly prejudicial. We agree with the state.

### A. Discovery

The rules of criminal procedure require the state to provide copies of documents and objects, at the defendant's request, that are material to the defense, that the state plans to introduce in its case-in-chief, or that belong to the defendant. Tenn. R. Crim. P. 16(a)(1)(F). Rule 16 further proscribes that

[i]f a party fails to comply with this rule, the court may:

(A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms or conditions;

(B) grant a continuance;

(C) prohibit the party from introducing the undisclosed evidence; or

(D) enter such other order as it deems just under the circumstances.

Tenn. R. Crim. P. 16(d)(2). "Whether an exclusionary sanction is appropriate depends upon whether the defendant has actually been prejudiced in the development and presentation of his case by the prosecution's failure to make a proper and timely disclosure of the evidence in question and whether that prejudice cannot be otherwise eradicated by a continuance or means other than suppression." *State v. Quincy L. Henderson*, No. 02C01-9706-CR-00227, 1998 WL 242608, at *5 (Tenn. Crim. App., at Jackson, May 12, 1998) (citing *State v. Garland*, 617 S.W.2d 176, 185 (Tenn. Crim. App. 1981). "[T]he burden rests on the defense to show the degree to which the impediments to discovery hindered trial preparation and defendant at trial." *State v. Brown*, 836 S.W.2s 530, 548 (Tenn. 1992). "[P]rejudice arising from a discovery violation will not be found if it is shown that the defense was otherwise aware of the undisclosed evidence." *Henderson*, 1998 WL 242608, at *5.

In this case, the state sought to admit a traffic citation issued to the defendant through the testimony of an assistant city court clerk. The state claimed they did not discover the actual citation until the day of trial. The defense objected to the admission of the evidence, arguing that it violated discovery. The trial court overruled the objection. At the defendant's hearing on his motion for new trial, the state argued that defense counsel would have been on notice of the traffic citation if she had availed herself of the state's offered open-file discovery because the file contained a document entitled "Memphis City Traffic Citations Listing." The state further argued that the citation was not otherwise discoverable. The trial court ruled that there was no discovery violation, stating that counsel would have been on notice of the citation if she had properly reviewed the state's file.

The record before this court does not contain a defense motion for discovery of documents within the state's control pursuant to Rule 16. However, the record indicates that the state offered defense counsel the opportunity to review the state's entire file on numerous occasions. While the record does not indicate that defense counsel was actually aware of the citation, she reasonably should have been aware of the existence of the citation based on the state's file, which included the "Memphis City Traffic Citations Listing." Therefore, the record does not preponderate against the trial court's determination that the state did not violate discovery. Additionally, the defendant has not shown that his defense was prejudiced by any alleged discovery violation. The state presented eyewitness testimony linking the defendant to the car on the night of the shooting. Other witnesses testified to the make and model of the shooter's car despite not being able to identify the defendant. Therefore, the defendant had ample opportunity to prepare a defense rebutting the state's assertion that he

was driving a green Plymouth Breeze on June 13, 2004. Accordingly, the defendant is not entitled to relief on this issue.

## B. Relevance and Prejudicial Effect

The defendant also argued that the evidence was irrelevant and prejudicial to the defense. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Once the court concludes the evidence is relevant, the court should exclude the evidence if its probative value is substantially outweighed by its prejudicial effect. Tenn. R. Evid. 403; *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002). A trial court's decision as to the relevance of evidence under Rule 401 will be reversed only upon a showing of abuse of discretion. *State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003). The defendant contends that the citation was irrelevant because (1) the police issued it over a month prior to the shooting, (2) the state did not present proof to verify the signature on the citation, and (3) the state did not present proof that the defendant was "the actual driver at the time the ticket was issued." These matters address the weight of the evidence rather than its relevance, and the defense thoroughly cross-examined the witness regarding these issues. The trial court found that the citation was relevant to connect the defendant to the vehicle that eyewitnesses saw at the crime scene, and the defendant has not shown that the trial court abused its discretion in so ruling. Accordingly, we conclude that the defendant's argument is without merit.

## IV. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his convictions for first degree murder and criminal attempt to commit first degree murder. Specifically, he contends that the state coerced the eyewitness's identification of the defendant during the trial and that the eyewitness's identification was insufficient because it was uncorroborated.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn

from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

First degree murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Premeditation is explained as follows:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* An intentional act requires that the person have the desire to engage in the conduct or cause the result. *Id.* § 39-11-106(a)(18). Whether premeditation is present is a question of fact for the jury, and it may be determined from the circumstances surrounding the killing. *Bland*, 958 S.W.2d at 660; *State v. Anderson*, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Circumstances that may be indicative of premeditation include declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. *State v. Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005); *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). A defendant's failure to render aid to a victim can also indicate the existence of premeditation. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Under *Millen v. State*,[1] a defendant is guilty of first degree murder when he intentionally tries to kill one person but actually kills an unintended victim. 988 S.W.2d 164, 168 (Tenn. 1999).

---

[1] In this case, the Tennessee Supreme Court ruled that Tennessee's first degree murder statute did not require the application of the common law doctrine of transferred intent because the statute does not require proof that the defendant intended to kill a specific victim. *Millen v. State*, 988 S.W.2d 164, 168 (Tenn. 1999).

Criminal attempt is statutorily defined as follows:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101.

Viewed in the light most favorable to the state, the evidence revealed that the defendant fired multiple shots towards a group of people, hitting Nicholas Harris in the neck and striking Darren Champion in the back. Mr. Harris was paralyzed as a result of the gunshot wound and died over a year after the shooting. Mr. Champion survived his injury. The defendant essentially contends that Ladarius Weathersby's identification testimony was not credible. However, the jury resolved the witness's credibility in favor of the state. This court will not reevaluate his credibility. *Reid*, 91 S.W.3d at 277. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing *State v. Strickland*, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). Mr. Weathersby identified the defendant as the shooter in a photospread prior to trial and identified him in the courtroom. Therefore, we conclude that any rational jury could find that the defendant was the individual who shot Nicholas Harris and Darren Champion. Accordingly, the defendant's argument is without merit.

**Conclusion**

Based on the foregoing reasons, we affirm the judgments of the trial court.

-16-

_____

J.C. McLIN, JUDGE